IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TAMMY H.,[1]

     Plaintiff,

   v.

KILOLO KIJAKAZI, Acting Commissioner
of Social Security,

     Defendant.

Case No. 3:21-cv-01374-SB

**OPINION AND ORDER**

---

**BECKERMAN, U.S. Magistrate Judge.**

   Tammy H. ("Plaintiff") brings this appeal challenging the Commissioner of Social

Security's ("Commissioner") denial of her application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act. The Court has jurisdiction to hear this appeal pursuant

to 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a magistrate judge

pursuant to 28 U.S.C. § 636(c). For the reasons explained below, the Court reverses the

---

  [1] In the interest of privacy, this opinion uses only the first name and the initial of the last
name of the non-governmental party.

PAGE 1 – OPINION AND ORDER

Commissioner's decision because it is based on harmful legal error and not supported by substantial evidence.

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "not supported by substantial evidence or based on legal error." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* Where the record as a whole can support either the grant or denial of Social Security benefits, the district court "may not substitute [its] judgment for the [Commissioner's]." *Bray*, 554 F.3d at 1222 (quoting *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## BACKGROUND

## I.      PLAINTIFF'S APPLICATION

Plaintiff was born in September 1973, making her forty-one years old on August 1, 2015, her alleged disability onset date.[2] (Tr. 24, 58, 72.) Plaintiff is a high school graduate who has

---

[2] To be eligible for DIB, "a worker must have earned a sufficient number of [quarters of coverage] within a rolling forty-quarter period." *Herbert v. Astrue*, No. 1:07-cv-01016, 2008 WL

completed some college coursework and past relevant work experience as an "order clerk/administrative clerk." (*Id.* at 24, 36, 189.) In her DIB application, Plaintiff alleges disability due to degenerative disc disease, posttraumatic stress disorder ("PTSD"), obsessive compulsive disorder ("OCD"), cervical radiculopathy, arthritis, spinal stenosis, and attention deficit hyperactivity disorder ("ADHD"). (*Id.* at 59, 73.)

The Commissioner denied Plaintiff's application initially and upon reconsideration, and on February 14, 2020, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 15.) Plaintiff and a vocational expert ("VE") appeared and testified at an administrative hearing held on October 29, 2020. (*Id.* at 33-57.) On November 18, 2020, the ALJ issued a written decision denying Plaintiff's application. (*Id.* at 15-25.) On July 16, 2021, the Appeals Council denied Plaintiff's request for review, making the ALJ's written decision the final decision of the Commissioner. (*Id.* at 1-6.) Plaintiff now seeks judicial review of that decision.

## II.    THE SEQUENTIAL PROCESS

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12

---

4490024, at *4 n.3 (E.D. Cal. Sept. 30, 2008). Workers accumulate quarters of coverage based on their earnings. *Id.* Typically, "the claimant must have a minimum of twenty quarters of coverage [during the rolling forty-quarter period to maintain insured status]. . . . The termination of a claimant's insured status is frequently referred to as the 'date last insured' or 'DLI.'" *Id.* (citations omitted). Thus, Plaintiff's date last insured ("DLI") of September 30, 2022 (Tr. 15) reflects the date on which her insured status terminated based on the previous accumulation of quarters of coverage. If Plaintiff established that she was disabled on or before September 30, 2022, she is entitled to DIB. *See Truelsen v. Comm'r Soc. Sec.*, No. 2:15-cv-02386, 2016 WL 4494471, at *1 n.4 (E.D. Cal. Aug. 26, 2016) ("To be entitled to DIB, plaintiff must establish that he was disabled . . . on or before his date last insured." (citing *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999))).

months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential

process for determining whether an applicant is disabled within the meaning of the Social

Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five

steps are: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the

claimant has a severe impairment; (3) whether the impairment meets or equals a listed

impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the

claimant can perform other work that exists in significant numbers in the national economy. *Id.*

at 724-25.

The claimant bears the burden of proof for the first four steps. *See Bustamante v.*

*Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any

of those steps, the claimant is not disabled. *See id.* at 954. The Commissioner bears the burden of

proof at step five, where the Commissioner must show the claimant can perform other work that

exists in significant numbers in the national economy, "taking into consideration the claimant's

residual functional capacity, age, education, and work experience." *Tackett*, 180 F.3d at 1100. If

the Commissioner fails to meet this burden, the claimant is disabled. *See Bustamante*, 262 F.3d

at 954.

## III.    THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is

disabled. (Tr. 15-25.) At step one, the ALJ found that Plaintiff had not engaged in substantial

gainful activity since August 1, 2015, her alleged disability onset date. (*Id.* at 17.) At step two,

the ALJ determined that Plaintiff suffers from thirteen severe, medically determinable

impairments: (1) "cervical spine degenerative disc disease with radiculopathy, status post

fusion," (2) "thoracic and lumbar spine degenerative disc disease," (3) "right shoulder superior

labrum anterior to posterior (SLAP) tear, rotator cuff syndrome, and degenerative joint disease,"

PAGE 4 – OPINION AND ORDER

(4) "bilateral carpal tunnel syndrome," (5) "bilateral ulnar neuropathy," (6) depression, (7)

anxiety, (8) "unspecified somatic symptom and related disorder," (9) ADHD, (10) PTSD, (11)

"reactive attachment disorder," (12) "rumination disorder," and (13) "uncomplicated drug and

alcohol abuse[.]" (*Id.*)

      At step three, the ALJ concluded that Plaintiff did not have an impairment that meets or

medically equals a listed impairment. (*Id.* at 18.) The ALJ then concluded that Plaintiff had the

residual functional capacity ("RFC") to perform light work, subject to these limitations:

(1) Plaintiff "can never crawl or climb ladders, ropes or scaffolds," (2) Plaintiff "can

occasionally climb ramps and stairs, balance, stoop, kneel, and crouch," (3) Plaintiff "can

occasionally reach above shoulder level and frequently reach in all other directions," (4) Plaintiff

"can frequently handle and finger," (5) Plaintiff "can tolerate occasional exposure to extreme

cold and vibration," but she cannot tolerate "exposure to hazards such as unprotected heights or

moving mechanical machinery," (6) Plaintiff "can understand, remember, and carry out simple,

routine tasks in a routine work setting involving few workplace changes," and (7) Plaintiff "can

never perform rapid pace assembly line work." (*Id.* at 19.) At step four, the ALJ found that

Plaintiff was unable to perform her past relevant work. (*Id.* at 24.) At step five, the ALJ

determined that Plaintiff was not disabled because a significant number of jobs existed in the

national economy that she could perform, including work as a mail clerk, garment sorter, and

warehouse checker. (*Id.* at 25.)

## DISCUSSION

      In this appeal, Plaintiff argues that the ALJ erred in three principal ways. (Pl.'s Opening

Br. at 10-11, ECF No. 13.) First, Plaintiff argues that the ALJ erred by failing to provide clear

and convincing reasons for discounting Plaintiff's symptom testimony. (*Id.*) Second, Plaintiff

argues that the ALJ erred by failing to provide legally sufficient reasons for discounting the

PAGE 5 – OPINION AND ORDER

opinion of Plaintiff's physician, Christian Devaux, D.O. ("Dr. Devaux"). (*Id.*) Finally, Plaintiff argues that the ALJ erred by concluding at step two that Plaintiff's migraines are not a severe impairment. (*Id.*)

As explained below, the Court finds that the ALJ's decision is based on harmful legal error and not supported by substantial evidence, and therefore reverses the Commissioner's decision.

## I.    PLAINTIFF'S SYMPTOM TESTIMONY

### A.    Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation omitted).

### B.    Analysis

There is no evidence of malingering here and the ALJ determined that Plaintiff provided objective medical evidence of underlying impairments which might reasonably produce the symptoms alleged. (*See* Tr. 20, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms"). The ALJ was therefore required to provide clear and convincing reasons for discounting Plaintiff's

symptom testimony. *See Ghanim*, 763 F.3d at 1163. The Court finds that the ALJ failed to meet that standard here.

### 1.    Plaintiff's Daily Activities

Plaintiff argues that substantial evidence does not support the ALJ's decision to discount her testimony based on her daily activities. (*See* Pl.'s Opening Br. at 17-18.) The Court agrees.

### a.    Relevant Authorities

An ALJ may discount a claimant's symptom testimony based on activities that are incompatible with the claimant's testimony regarding the severity of her symptoms. *See Burrell v. Colvin*, 775 F.3d 1133, 1137-38 (9th Cir. 2014) (explaining that "[i]nconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination"); *Garrison*, 759 F.3d at 1016 (stating that a claimant's activities have "bearing on [his or her] credibility" if the reported "level of activity" is "inconsistent with [the claimant's] claimed limitations"). Notably, however, there must be a meaningful inconsistency between the claimant's daily activities and symptom testimony. *See Harris v. Kijakazi*, No. 21-35136, 2022 WL 1262011, at *1 (9th Cir. Apr. 28, 2022) (holding that the ALJ committed harmful error in discounting the claimant's symptom testimony, and explaining that the claimant's "limited daily activities were not meaningfully inconsistent with her symptom testimony").

"An ALJ may [also] consider any work activity, including part-time work, in determining whether a claimant is disabled[.]" *Ford v. Saul*, 950 F.3d 1141, 1156 (9th Cir. 2020) (citation omitted). In *Bray*, for example, the ALJ discounted the claimant's "statement that she [was] incapable of walking more than half a block without stopping to catch her breath and using a nebulizer or inhaler, that she [was] unable to lift twenty pounds, and that she [could not] carry as much as ten pounds 'very far.'" 554 F.3d at 1226. The Ninth Circuit held that substantial

evidence supported the ALJ's decision to discount the claimant's testimony regarding the severity and "characterization of her symptoms." *Id.* at 1226-27. In so holding, the Ninth Circuit explained that the ALJ made specific findings that "belie[d] [the claimant's] claim of debilitating respiratory illness." *Id.* at 1227. Those findings included the ALJ's "not[e] that . . . [the claimant] recently worked as a personal caregiver for two years, and ha[d] sought other employment since then[.]" *Id.*

### b.    The ALJ's Findings

In discounting Plaintiff's testimony, the ALJ considered Plaintiff's "daily activities in evaluating the intensity, persistence and limiting effects of [her] symptoms." (Tr. 22.) Specifically, the ALJ considered Plaintiff's ability to work part-time at a childcare facility, perform unspecified housework, prepare meals, and shop for groceries. (*Id.*; *see also id.* at 853, reflecting that Plaintiff started working part-time in a "nursery at church" in early 2020.) The ALJ acknowledged that Plaintiff testified that her work "tasks have been reduced due to her physical difficulty," she could not work more than twenty hours per week, and she has "difficulty grocery shopping" and "difficulty chopping vegetables and lifting pans." (*Id.* at 22.) The ALJ, however, determined that despite being "significantly limited, [Plaintiff's] ability to maintain part-time work and function independently support the [RFC]," and that the RFC "accounted for" Plaintiff's "complaints of pain and difficulties with manipulative activities[.]" (*Id.*)

### c.    Disposition

Plaintiff argues that the ALJ erred in discounting her symptom testimony based on her daily activities. (Pl.'s Opening Br. at 17-18.) In so arguing, Plaintiff emphasizes that her part-time "work activity [is] entirely consistent with her testimony," the ALJ "did not cite to any evidence indicating that [her caregiver] job was more demanding than [she] described," and the

ALJ "did not identify any aspects of [her] household chores that undermined her [testimony] either." (*Id.*)

The Commissioner does not defend the ALJ's suggestion that Plaintiff's ability to perform unspecified housework, prepare meals, and shop for groceries undermines her symptom testimony. (*See* Def.'s Br. at 3-9, ECF No. 14.) Instead, the Commissioner focuses only on Plaintiff's part-time work, and suggests that the ALJ appropriately discounted Plaintiff's testimony on the ground that it was inconsistent with her ability to perform part-time work. (*See id.* at 4-5, 9, addressing the ALJ's reliance on part-time work, arguing that the "Court should uphold the ALJ's finding," and asserting that Plaintiff's ability to "maintain this level of work conflicted with her allegations of being unable to concentrate and having constant, debilitating pain that required her to recline large portions of the day," that Plaintiff's "ability to care for small children half the week conflicted with [her] extreme allegations," and that Plaintiff's "ability to work part-time, caring for babies, refuted her drastic complaints about her symptoms").

The Commissioner's argument is not supported by the Ninth Circuit case on which she relies. The Commissioner asserts that the situation presented here is similar to the one the Ninth Circuit addressed in *Bray*. (*See id.* at 4, 9, relying on *Bray* and arguing that Plaintiff's "case is similar to *Bray*"). In *Bray*, the ALJ discounted the claimant's testimony based on his ability to work part-time as a caregiver for an ill friend. 554 F.3d at 1221-27. In doing so, the ALJ "made specific findings," and identified the portions of the claimant's testimony that the ALJ found inconsistent with the claimant's ability to work part-time. *See id.* at 1226-27 (explaining that the "ALJ made specific findings," including that the claimant "recently worked as a personal caregiver for two years," in discounting the claimant's "statement that she [was] incapable of

walking more than half a block without stopping to catch her breath and using a nebulizer or inhaler, that she [was] unable to lift twenty pounds, and that she [could not] carry as much as ten pounds 'very far'"). Unlike the ALJ in *Bray*, the ALJ here did not explain how Plaintiff's part-time work conflicted with any specific portions of her testimony. (*See* Tr. 22, reflecting that the ALJ recounted portions of Plaintiff's testimony and stated that Plaintiff's ability to work part-time supported the RFC and that the RFC "accounted for" Plaintiff's "complaints of pain and difficulties with manipulative activities").

The ALJ's analysis was insufficient because he did not specifically identify any inconsistencies between Plaintiff's testimony and Plaintiff's ability to work part-time. *See Talia H. v. Comm'r, Soc. Sec. Admin.*, No. 3:19-cv-01815-MK, 2021 WL 53330, at *4-5 (D. Or. Jan. 6, 2021) (rejecting the Commissioner's reliance on *Bray* and distinguishing *Bray* in part on the ground that the ALJ did not provide "specific findings"). The Commissioner attempts to fill in the gaps in the ALJ's analysis by identifying potential inconsistencies between Plaintiff's testimony and the level of work Plaintiff performed.[3] (*See* Def.'s Br. at 4-5, 9.) The ALJ, however, did not identify these alleged inconsistencies (*see* Tr. 22), and the Court is constrained to review the reasons the ALJ asserted. *See Burrell*, 775 F.3d at 1138 ("But the ALJ did not identify those inconsistencies. We are constrained to review the reasons the ALJ asserts.") (simplified).

_____

[3] The Commissioner takes a similar approach to the ALJ's assessment of Plaintiff's testimony about her physical impairments. (*Compare* Tr. 20-21, setting forth the ALJ's assessment of Plaintiff's testimony about her back and neck pain and upper extremity limitations, *with* Def.'s Br. at 4-9, comparing and contrasting Plaintiff's testimony and the medical evidence in ways the ALJ's summary of both positive and negative findings did not). Consistent with Ninth Circuit caselaw, the Court addresses the specific reasons the ALJ asserted. *See Lambert v. Saul*, 980 F.3d 1266, 1278 (9th Cir. 2020) (stating that an ALJ must "identif[y] *which* testimony []he found not credible, and . . . explain[] *which* evidence contradicted that testimony") (simplified).

The Court also notes that Plaintiff's testimony reflects that her part-time work was quite limited. (*See* Tr. 41-43, reflecting that Plaintiff testified that she works part-time "patting the babies at the daycare so they can go to sleep," she works twenty hours per week and would not be "able to work more hours if more hours were available," and her employer has "already reduced [her] tasks to going in and [largely] just patting [the babies] when they sleep, [as] sitting on the floor is an issue [and] patting [the babies] is an issue, depending on . . . how [she] sits"; *id.* at 46-49, noting that Plaintiff testified that she has difficulty bending over and lifting, carrying, and placing the babies, in particular babies who weigh at least "25 pounds," and that she receives assistance and support from "the girls" at the facility who "work [with her] as a team" in performing tasks). It is not clear how this testimony suggests that Plaintiff's work activities were more taxing that her claimed limitations. *Cf. Christopher K. v. Comm'r Soc. Sec. Admin.*, No. 6:22-cv-00412-HZ, 2023 WL 34445, at *6 (D. Or. Jan. 3, 2023) (distinguishing cases where the ALJ relied on a claimant's part-time work and explaining that in many of "those cases, . . . the claimants 'engaged in more taxing activities' than their alleged incapacity would suggest") (citations omitted); *see also Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161-62 (9th Cir. 2008) ("[T]he record here does not establish whether [the claimant] held himself out as available for full-time or part-time work. Only the former is inconsistent with his disability allegations.").

For these reasons, the ALJ erred in discounting Plaintiff's testimony based on her activities. *See Stipek v. Kijakazi*, No. 21-35731, 2022 WL 2167789, at *1 (9th Cir. June 16, 2022) ("Because we must review the ALJ's decision based on the reasoning and factual findings offered by the ALJ, not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking, we reject the Commissioner's argument[.]") (simplified); *Caldwell v. Saul*,

840 F. App'x 907, 911 (9th Cir. 2020) ("We agree . . . that the ALJ erred in not making specific findings to support the conclusion that [the claimant's] daily activities undercut his subjective testimony.").

### 2.    Mental Health Symptoms

The parties agree that the ALJ discounted Plaintiff's testimony on the ground that her mental health improved with treatment. (*See* Pl.'s Opening Br. 15-16, addressing treatment effectiveness and the ALJ's finding that Plaintiff's "mental impairments 'responded well' to treatment"; Def.'s Br. at 5-9, addressing the effectiveness of and Plaintiff's improvement with mental health treatment). The parties disagree about whether substantial evidence supports such a decision.

An ALJ may discount a claimant's testimony based on evidence of improvement with treatment. *See Borowick v. Kijakazi*, No. 21-36022, 2022 WL 17729249, at *1 (9th Cir. Dec. 16, 2022) (affirming the ALJ's decision to discount the claimant's testimony, in part because the claimant's fatigue improved with treatment); *Guthrie v. Kijakazi*, No. 21-36023, 2022 WL 15761380, at *1 (9th Cir. Oct. 28, 2022) (holding that the ALJ "reasonably relied on evidence of [the claimant's] improvement with treatment"). An ALJ, however, is required to examine any evidence suggesting that the claimant improved with treatment in the "broader context of [the claimant's] impairment." *Attmore v. Colvin*, 827 F.3d 872, 877 (9th Cir. 2016) (citation omitted). Thus, "[a]n ALJ cannot simply 'pick out a few isolated instances of improvement over a period of months or years' but must interpret 'reports of improvement . . . with an understanding of the patient's overall well-being and the nature of her symptoms.'" *Id.* (quoting *Garrison*, 759 F.3d at 1017). Consistent with this understanding, "the examples [of improvement that] an ALJ chooses 'must *in fact* constitute examples of a broader development.'" *Id.* (quoting *Garrison*, 759 F.3d at 1018).

Plaintiff suggests that in discounting her testimony, the ALJ picked out isolated examples of improvement in her mental health symptoms, and failed to cite examples of a broader development. (Pl.'s Opening Br. at 15.) Citing record evidence from September and November 2016, June 2019, and July 2020, Plaintiff argues that contrary to the ALJ's finding of improvement, her "mental impairments did not respond to treatment." (*Id.* at 16.)

Plaintiff alleges disability due to, among other things, PTSD, OCD, and ADHD, and the ALJ found that Plaintiff's ADHD, PTSD, depression, and anxiety were severe impairments. (Tr. 17, 59, 73.) The ALJ cited examples suggesting that Plaintiff's mental impairments have "responded well to treatment." (*Id.* at 22.) Specifically, the ALJ cited these examples from 2017 and 2018:

- "In June 2017, [Plaintiff] reported she had been doing really well with taking one Adderall a day. She was able to focus much better, anxiety was better, sleep was better, and school and work were going well." (*Id.*, citing Tr. 364.)

- "In April 2018, [Plaintiff] reported doing well on Adderall and Paxil. The medication had helped a lot with her job and she had been able to focus and stay on task much better." (*Id.*, citing Tr. 343-44.)

Immediately thereafter, the ALJ stated that Plaintiff's "[m]ental health counseling has been sporadic." (*Id.*) The ALJ then summarized chronologically portions of Plaintiff's mental health records. (*Id.*)

The examples on which the ALJ relied here were not in fact indicative of a broader development. *See generally Attmore*, 827 F.3d at 877 (stating that the "examples on which the ALJ relied . . . were not in fact indicative of a 'broader development,'" and that the highlighted improvement was "only temporary" and one area of "improvement was quite limited"); *Thomson*

*v. Kijakazi*, No. 21-35152, 2022 WL 1239464, at *3 (9th Cir. Apr. 27, 2022) (rejecting the ALJ's

reliance on alleged improvement given his failure to "square" that finding with other noteworthy

evidence that "f[e]ll within the alleged onset disability period").

The primary examples the ALJ cited are from June 2017 and April 2018, and the ALJ

otherwise largely summarized mental health records from June 2018 to August 2020. (*See*

Tr. 22, citing two specific examples located at Tr. 343-44 and Tr. 364 in the paragraph stating

that Plaintiff's mental impairments "responded well to treatment"). The record as a whole,

however, demonstrates that the ALJ's examples are not in fact "demonstrative of a broader trend

of improvement in Plaintiff's psychological symptoms." *Jim H. v Kijakazi*, No. 3:21-cv-98-SI,

2021 WL 5862163, at *8 (D. Or. Dec. 10, 2021) (focusing on evidence that pre- and post-dated

the ALJ's example of improvement and daily activities inconsistent with the claimant's

testimony and explaining that "[c]onsidered as a whole, the record show[ed] that the one positive

example of activity cited by the ALJ was not demonstrative of a broader trend of improvement in

[the claimant's] psychological symptoms," and therefore it did "not satisfy the clear and

convincing standard").

The following medical records reflect that at minimum, Plaintiff complained of waxing

and waning mental health symptoms throughout the relevant period, and that the ALJ's examples

of improvement are not indicative of broader development, as Plaintiff's providers recommended

inpatient and outpatient treatment several years after the alleged disability onset date:

- November 10, 2015: Plaintiff reported that her anxiety had been "out of
  control," she had been "bing[ing] and purging on a regular basis, anxious and
  nervous most of the time," her symptoms included "excessive worry,
  insomnia, irritability, muscle tension, nervous/anxious behavior, obsessions,

palpitations and panic," her symptoms "occur constantly" and were "causing significant distress," and she had been "binging and purging again over the past 5 months." (Tr. 396.)

- September 2, 2016: Plaintiff reported that "[n]early every day" she had been bothered by "[f]eeling nervous, anxious, or on edge," "[n]ot being able to stop or control worrying," "[w]orrying too much about different things," "[t]rouble relaxing," and "[f]eeling afraid as if something awful might happen." (*Id.* at 385-86.) Plaintiff also reported that these issues had made it "[v]ery difficult" for her to "do [her] work, take care of things at home, or get along with other people," and Plaintiff's provider noted that Plaintiff was "very anxious, on [the] verge of [a] panic attack, [and] shaky." (*Id.*)

- November 1, 2016: Plaintiff's provider noted that she appeared anxious and was "[t]earful at times," she has a "long" history of "anxiety and OCD and anorexia/bulimia [and] admit[ted] to ongoing symptoms," her symptoms include "compulsions (major OCD), decreased concentration, excessive worry, insomnia, irritability, muscle tension, nervous/anxious behavior, obsessions and panic," and "[t]he severity of symptoms [was] interfering with [her] daily activities and . . . incapacitating." (*Id.* at 377-78.)

- July 24, 2017: Plaintiff reported "having a lot of anxiety the past couple weeks since [she] had to get [a] restraining order on [a] long-term boyfriend," and endorsed frequent symptoms of depression and anxiety. (*Id.* at 360-61.)

- January 15, 2019: Plaintiff reported that she suffers from "extreme anxiety." (*Id.* at 500-02.)

PAGE 15 – OPINION AND ORDER

- January 29, 2019: the fire department transported Plaintiff to the emergency room because she had fallen at home and "was too scared to move when she regained consciousness[, and thus] called 911," and a nurse noted that Plaintiff was "crying during triage" and reported that she felt overwhelmed due to her need for neck surgery and an encounter earlier that day with police "because her husband [was] stalking her," she did not "remember how" she fell, and she felt "like her 'eyeballs [we]re popping out' [after she fell and] was crying, uncooperative, cooperative, not crying, [and] going through various stages of emotions." (*Id.* at 510-11.)

- April 16, 2019: social services completed an "[i]ntervention" and consultation with Plaintiff regarding domestic violence. (*Id.* at 546.)

- April 23, 2019: Plaintiff reported exacerbation of her anxiety due to "an ex-boyfriend/husband [who was] harassing her." (*Id.* at 543.)

- June 10, 2019: Plaintiff presented for an intake assessment and reported that she suffers from bulimia "with daily purging," and has a past history of emotional, physical, sexual, child, and substance abuse. (*Id.* at 638-46.) Plaintiff also reported that she is "always worried" and "very scared" due to a violent "ex [who] still stalks [her] and is regularly trying to find [her]," she "use[s] a lot of things to mask [her] pain, including drugs [and] alcohol, risky behaviors, online dating, etc.," she "cope[s] with alcohol and pot" and "drank a half bottle of whiskey" the previous day, she has "severe PTSD symptoms including increased anxiety and fear" and "symptoms of Major Depressive Disorder including low mood and energy." (*Id.* at 638-40.) Further, Plaintiff

reported "several" past "suicide attempts," including in September 2018, she consumes "one to two bottles of wine and about a gram of pot" per day, and she was "interest[ed] in a substance use treatment program." (*Id.* at 638-41.) Plaintiff's reports generated scores indicative of severe anxiety, depression, and sleep problems, and "reached diagnostic criteria for Major Depressive Disorder, PTSD, Bulimia Nervosa, Alcohol Use Disorder, and Cannabis Use Disorder," but additional assessment was necessary to rule out ADHD and OCD. (*Id.* at 641, 644-46.)

- June 11, 2019: Plaintiff endorsed many of the same mental health symptoms and history during a counselor's initial intake assessment, and the counselor determined that Plaintiff's reported symptomatology met the criteria for PTSD, major depressive disorder, alcohol use disorder, cannabis use disorder, and "by history [ADHD] combined type and [OCD]." (*Id.* at 806-10.)

- June 13, 2019: Plaintiff's counselor and another provider discussed Plaintiff's mental health symptoms and agreed that they were concerned, and Plaintiff's counselor "recommended that [Plaintiff] consider prioritizing inpatient psychiatric care due to the impact that [bulimia] symptoms [were] having on her physical health." (*Id.* at 647.)

- June 21, 2019: Plaintiff's counselor called and asked to speak with Dr. Devaux, noting that she was "concerned some of [Plaintiff's] behaviors being high risk and would like to coordinate with [Dr. Devaux] to make sure [Plaintiff] is on the correct path for treatment." (*Id.* at 704-05.)

///

- June 21, 2019: During a call with Dr. Devaux, Plaintiff's counselor explained that she was "concerned that [Plaintiff] may need inpatient treatment for [an] eating disorder and substance abuse." (*Id.* at 702, 705.)

- June 27, 2019: Dr. Devaux noted that Plaintiff had "recently . . . been drinking up to 1 bottle of wine per day," he advised Plaintiff that it "would be prudent to change her from Adderall to Strattera based on her history of substance abuse," he believed that it would be "beneficial for [Plaintiff] to pursue a program related" to the "binging and purging [she] [h]as done . . . since she was a child," and he was not certain that Plaintiff "would meet any criteria for [an] inpatient rehabilitation but . . . she at the very least would benefit from an outpatient program." (*Id.* at 702, 704.)

- July 5, 2019: Plaintiff called Dr. Devaux's office to report that she had not received two prescriptions and "fe[lt] so depressed [and] hopeless." (*Id.* at 701.)

- October 24, 2019: Plaintiff's counselor "inquired about substance use and abuse and other unhealthy behaviors in which [Plaintiff] report[ed] no changes," and continued to "encourage[] [Plaintiff] to consider inpatient treatment." (*Id.* at 837.)

- December 5, 2019: Plaintiff's session with her counselor focused on "outpatient referrals for eating disorder and substance abuse illnesses," and Plaintiff stated that "she called and [was] now waiting for a call back." (*Id.* at 844-45.)

///

PAGE 18 – OPINION AND ORDER

- February 3, 2020: Plaintiff complained about "feeling emotional lability that [was] worsening" and being "very depressed" if she misses her dosage of Strattera for a "couple of days." (*Id.* at 858.)

- July 31, 2020: Plaintiff presented for a mental health assessment and reported "struggling with focus, racing thoughts, depression, anxiety with feeling of pending doom," her "[e]xcessive worry/anxiety [was an] 8/10 intensity that include[d] uncontrollable crying, shaking, anger, [and] heart palpitations," she was engaging in "bulimic behaviors 10x a day," and she had been "self-medicating [and engaging in] impulsive behaviors." (*Id.* at 921-24.) A certified alcohol and drug counselor's primary diagnoses were ADHD, reactive attachment and rumination disorders, and an "[u]nspecified somatic symptom and related disorder." (*Id.*)

Given this evidence, including a reported suicide attempt in September 2018 and recommendations that Plaintiff pursue inpatient and outpatient treatment several years after the alleged disability onset date, the Court concludes that the records on which the ALJ relied do not constitute examples of a broader development and, therefore, do not satisfy the clear and convincing reasons standard. *See Garrison*, 759 F.3d at 1018 ("While ALJs obviously must rely on examples to show why they [discounted a claimant's testimony], the data points they choose must in fact constitute examples of a broader development to satisfy the applicable 'clear and convincing" standard.").

Further, to the extent the ALJ attempted to discount Plaintiff's testimony based on her "sporadic" pursuit of mental health treatment (*see* Tr. 22, stating only that "[m]ental health counseling has been sporadic"), the Court finds that the ALJ erred in doing so. *See Alderson v.*

*Saul*, 859 F. App'x 25, 26 (9th Cir. 2021) (holding that "the ALJ erred in using a failure to seek treatment as a basis to discount [the claimant's testimony] regarding her depression and other mental illnesses," and noting that "[i]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment") (simplified); *cf. Garrison*, 759 F.3d at 1018-24 (assessing whether the claimant's treatment decisions "were at least in part a result of her underlying bipolar disorder and her other psychiatric issues"). The Court also notes that Plaintiff's primary care physician's clinic appeared to manage Plaintiff's mental health treatment for several years, and that Plaintiff also pursued treatment with other mental health providers.

In summary, the Court finds that the ALJ improperly focused on temporary and isolated periods of improvement in Plaintiff's mental health that were not representative of the continuing severity of her symptoms. Accordingly, substantial evidence does not support the ALJ's decision to discount Plaintiff's testimony on the ground that her mental health symptoms responded well to treatment. *See Attmore*, 827 F.3d at 879 (same). Given the absence of any other valid basis for doing so, the ALJ failed to provide clear and convincing reasons for discounting Plaintiff's mental health testimony. *See Garrison*, 759 F.3d at 1015-18 ("[The claimant] testified about her physical and mental health. We separately address the ALJ's grounds for discrediting each part of [the claimant's] testimony. . . . The ALJ did not offer specific, clear, and convincing reasons for rejecting [the claimant's] testimony concerning her physical and mental impairments.").

### 3. The ALJ's Remaining Analysis

The ALJ's remaining analysis addresses Plaintiff's physical impairments and related pain and limitations. (*See* Tr. 20-21, beginning with the boilerplate language that Plaintiff's testimony was "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision," and explaining that the evidence "supports" Plaintiff's allegations of "back and neck pain" and "upper extremity symptoms," but "allegations of

PAGE 20 – OPINION AND ORDER

debilitating symptoms are not consistent with the treatment record"; *cf. id.* at 22-23, addressing Plaintiff's "sporadic" and positive "response[]" to mental health treatment and "daily activities" before turning to medical opinion evidence).

The ALJ discounted Plaintiff's allegations of "debilitating" neck and back pain and upper extremity limitations on the ground that such allegations are "not consistent with the treatment record," but noted that the evidence otherwise "supports" Plaintiff's allegations. (*Id.* at 20-21.) In support, the ALJ largely summarized the objective medical evidence, such as positive and negative findings on physical exams, imaging results, and nerve-related studies. (*See id.* at 20-21.)

Notably, the evidence the ALJ cited included, among other things, cervical spine imaging that demonstrated "moderate to severe . . . degenerative disc disease with trace retrolisthesis" and "severe bilateral foraminal narrowing," and led to Plaintiff undergoing a cervical "discectomy and fusion in April 2019," nearly four years after she "reported new onset of neck pain," and alleged the onset of disability. (*Id.* at 21; *see also id.* at 500-04, January 15, 2019, a neurosurgeon stated that Plaintiff had "a long history of severe and chronic neck pain as well as bilateral upper extremity radiating pain and paresthesia throughout the entirety of both arms and hands," Plaintiff's pain has "been progressive particularly over the [previous] 2 years," and Plaintiff "would benefit from . . . [a] cervical discectomy and fusion to decompress the associated neural elements," as it "would help" alleviate her "symptoms of bilateral cervical radiculopathy due to severe bilateral foraminal narrowing"; *id.* at 72, alleging disability due to "[c]ervical radiculopathy").

The evidence the ALJ cited also included (1) July 2020 electromyography ("EMG") findings that were "consistent with chronic cervical radiculopathy," albeit not "active/acute"

post-surgery cervical radiculopathy, and (2) abnormal August 2020 imaging results and October 2020 exam findings, such as a "positive impingement sign, load compression test, painful arc and O'Brien test," regarding Plaintiff's right shoulder, which led to an orthopedic surgeon's diagnoses of a "superior labrum anterior-to-posterior (SLAP) tear and rotator cuff syndrome of the right shoulder." (*Id.* at 21, citing Tr. 915, 918, 932-36.)

Like the ALJ did in his decision (*see id.* at 21, 23), the Commissioner notes that Plaintiff's neck "symptoms improved" after her April 2019 surgery. (Def.'s Br. at 5; *cf.* Tr. 66, showing that a state agency physician reviewed the record and noted that during the period at issue, Plaintiff "developed worsening neck pain [with upper extremity symptoms] leading to a recent two level C[-]spine discectomy and fusion, [and] therefore it's medically reasonable that [she] is currently too limited to sustain full[-]time work, but she will keep improving in [terms of symptoms] and function and soon be again capable of resuming work activity"). Such a finding is inconsistent with Ninth Circuit case law. *See Thomson*, 2022 WL 1239464, at *1 (noting that the claimant's treatment included "intrusive [back] surgeries" and stating that "to the extent the ALJ relied on any alleged improvement in [the claimant's] treatment, the ALJ failed to square that with [the claimant's] pre-surgery symptoms which also f[e]ll within the alleged onset disability period" (citing *Smith v. Kijakazi*, 14 F.4th 1108, 1114 (9th Cir. 2021))); *see also Smith*, 14 F.4th at 1114 ("[A]lthough the ALJ properly determined that [the claimant's mental health] testimony was not credible regarding his capacity in the later period of his disability claim, the ALJ erred in rejecting [the claimant's] testimony wholesale without explaining how her rationale for finding the late-period testimony not credible applied to the early-period testimony.").

The ALJ's remaining reason for discounting Plaintiff's testimony about her physical pain and limitations (i.e., such testimony is "not consistent with the treatment record," a finding based

almost entirely on the objective medical evidence) is not supported by substantial evidence. *See Burrell*, 775 F.3d at 1140 ("[B]ecause this [remaining alleged] reason is weak on this record, we conclude that the ALJ erred in discrediting [the] [c]laimant's testimony."); *Harris*, 2022 WL 1262011, at *1 (observing that "'one weak reason' may be 'insufficient to meet the specific, clear and convincing standard'" (quoting *Burrell*, 775 F.3d at 1140)). But even if that were not the case, a lack of supporting or inconsistent objective medical evidence cannot provide the sole basis for discounting a claimant's testimony. *See McClaren v. Saul*, 812 F. App'x 500, 501 (9th Cir. 2020) (explaining that "inconsistencies with objective medical evidence . . . cannot provide the sole basis for an ALJ's credibility determination"); *Valdez v. Berryhill*, 746 F. App'x 676, 677 (9th Cir. 2018) (noting that "an ALJ may properly include lack of supporting medical evidence in the reasons to discredit claimant testimony as long as it is not the only reason" (citing *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005))).

That is especially true where, as here, the medical evidence the ALJ relied on concerns only physical impairments and does not address improperly discounted mental health testimony. *See Perez v. Colvin*, 548 F. App'x 445, 446 (9th Cir. 2013) (observing that the ALJ "gave reasons for rejecting [a claimant's doctor's] physical [RFC] assessment, [but] he did not specifically discuss or reject the doctor's separate assessment of the claimant's ability to do work," and that the ALJ "essentially rejected a key element of [the doctor's] opinion without giving any reasons for doing so," and remanding "for further proceedings at which the ALJ should consider [the doctor's] opinion regarding [the claimant's] depression and afford it the weight the ALJ deem[ed] appropriate"); *Harrold v. Berryhill*, 714 F. App'x 861, 870-71 (10th Cir. 2017) (remanding for further proceedings and explaining that the ALJ's discussion "relate[d] only to [the claimant's] physical symptoms" and the ALJ "made no findings specific to

the . . . [claimant's] testimony and other statements regarding her mental symptoms . . . and did not give specific reasons for discounting them or cite specific evidence in support of his determination that they were not credible"); *see also Garrison*, 759 F.3d at 1015-18 ("We separately address the ALJ's grounds for discrediting each part of [the claimant's] testimony.").

### 4. Conclusion

For these reasons, the Court finds that the ALJ committed harmful error in discounting Plaintiff's testimony.

## II. THE ALJ'S STEP-TWO FINDINGS

Plaintiff argues that although the ALJ resolved step two in her favor, the ALJ erred in concluding that her migraines are not a severe impairment. (Pl.'s Opening Br. at 10-12.) As this Court has explained, *see Valerie P. v. Kijakazi*, No. 3:21-cv-01160-SB, 2022 WL 2712956, at *3 (D. Or. July 23, 2022), a claimant bears the burden of demonstrating that an ALJ's step-two error was harmful. *See Howland v. Saul*, 804 F. App'x 467, 469 (9th Cir. 2020) (explaining that the ALJ bears "the burden of demonstrating harmful error," and that the "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination" (quoting *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012), *superseded by regulation on other grounds as recognized in Davis v. Kijakazi*, No. 21-3541, 2022 WL 2072656, at *1 (9th Cir. June 9, 2022))).

Where, as here, the ALJ resolves step two in the claimant's favor, the "claimant must do two things to demonstrate harmful error." *Valerie P.*, 2022 WL 2712956, at *3. One of the things a claimant must do to demonstrate harmful error is "identify and detail what limitations should have been included in the ALJ's RFC determination." *Id.* For example, in *Davis v. Berryhill*, 743 F. App'x 846, 849 (9th Cir. 2018), the Ninth Circuit explained that the claimant did "not identify any limitations stemming from [her allegedly severe] peripheral neuropathy [that] the ALJ did

not include in the sequential analysis," and thus the claimant had "not demonstrated any error that might be harmful." *Id.*; *see also Delgadillo v. Kijakazi*, No. 20-56211, 2022 WL 301548, at *3 (9th Cir. Feb. 1, 2022) (rejecting the claimant's argument that the ALJ "failed to consider the impact of [certain] functional impairments" because the claimant "fail[ed] to 'detail what other physical limitations' should have been included in the RFC'") (citation omitted); *Youngblood v. Berryhill*, 734 F. App'x 496, 498 (9th Cir. 2018) ("[The claimant] fails to identify . . . limitations that the ALJ should have incorporated into the RFC. As a result, [the claimant] has not argued the issue specifically and distinctly as required to invoke the Court's review.") (simplified).

Plaintiff's opening brief did not identify or detail any migraine-related limitations that the ALJ should have included in his RFC and VE hypothetical. (*See* Pl.'s Opening Br. at 11-20.) As a result, the Commissioner responded only to the arguments Plaintiff made (*see* Def.'s Br. at 14-16), and did not have the opportunity to respond to any arguments Plaintiff raised for the first time in her reply.

That is significant because in her reply, Plaintiff raised for the first time the argument that the ALJ committed harmful error because his RFC "did not include any limitations such as time off-task or [monthly] absen[ces] from work, which reflected an individual who would be suffering from a migraine headache up to 15 days a month." (Pl.'s Reply Br. at 4.) This argument was not properly presented, and Plaintiff deprived the Commissioner of the opportunity to respond. Thus, Plaintiff waived this argument, and the Court declines to consider it. *See Anderson v. Colvin*, 223 F. Supp. 3d 1108, 1131 (D. Or. 2016) ("Plaintiff raises for the first time in her reply brief that contrary to the regulations, the ALJ failed to [consider] her age and time out of the workforce when determining her RFC. This argument was not, however, properly presented because all issues must be raised in the initial brief. Accordingly, it will not be

considered.") (citations omitted); *Johnson v. Colvin*, No. 13-1139-HZ, 2014 WL 3851140, at *5 n.2 (D. Or. Aug. 1, 2014) ("Because Plaintiff failed to raise the error in his opening brief, the error is waived.").

The Court also notes that even if Plaintiff had not waived this argument, Plaintiff did not list migraines as an allegedly disabling impairment in her applications, testified that Botox injections "help[] so much" and make "a huge difference" in managing her migraines, and reported in 2019 that she had been "getting Botox injections for [the] past 10 years" and "they . . . help with her migraines." (Tr. 54-55, 59, 73, 88, 188, 896; *see also id.* at 263, reflecting that Plaintiff's counsel's letter to the Appeals Council did not list migraines as a severe impairment).

## III.    MEDICAL OPINION EVIDENCE

In her remaining assignment of error, Plaintiff argues the ALJ failed to provide legally sufficient reasons for discounting Dr. Devaux's opinion. (Pl.'s Opening Br. at 11, 18-20.) The Court declines to address this argument because, as explained below, the Court must remand this case for further proceedings given the conflicts and ambiguities in the record. *See Jon M. v. Saul*, No. 19-1903-SB, 2020 WL 7495184, at *7 (D. Or. Dec. 21, 2020) ("The Court does not address Plaintiff's argument that the ALJ also failed to provide legally sufficient reasons for discounting Dr. Paulsen's opinion because, as explained below, this case will be remanded for further proceedings." (citing *Dasher v. Astrue*, No. 09-6139-BR, 2010 WL 4923101, at *7 (D. Or. Nov. 29, 2010))).

## IV.    REMEDY

### A.    Applicable Law

"Generally when a court of appeals reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or

explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). In a number of cases, however, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits when [the three-part credit-as-true standard is] met." *Garrison*, 759 F.3d at 1020 (citations omitted).

The credit-as-true standard is met if three conditions are satisfied: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Id.* (citations omitted). Even when the credit-as-true standard is met, the district court retains the "flexibility to remand for further proceedings when the record [evidence] as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021.

### B.    Analysis

The Court concludes that it must remand Plaintiff's case for further administrative proceedings because the record has not been fully developed and further proceedings will be useful.

A district court may exercise its discretion to "remand for further proceedings if enhancement of the record would be useful." *Fahtima R. v. Comm'r of Soc. Sec.*, No. 18-5970-MJP, 2019 WL 2022461, at *4 (W.D. Wash. May 8, 2019) (citing *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000)). In *Fahtima R.*, for example, the court observed that the "the record show[ed] conflicts between unchallenged state agency doctor opinions and [a physician's improperly discredited] opinions that the ALJ [needed to] address[.]" *Id.* The court therefore

PAGE 27 – OPINION AND ORDER

remanded the case for further proceedings because "enhancement of the record would be useful."

*Id.*; *see also Graham v. Colvin*, No. 14-5311, 2015 WL 509824, at *5-8 (W.D. Wash. Feb. 6, 2015) (remanding for further proceedings and explaining that although the ALJ erred in discounting the claimant's testimony, the claimant did not challenge certain conflicting medical opinions and thus there were outstanding issues in the record about the extent of the claimant's limitations).

Plaintiff does not challenge the ALJ's finding that the state agency physicians' opinions were "somewhat persuasive," or the finding that Plaintiff's father's lay witness testimony was "not persuasive." (Tr. 23.) The ALJ found the other medical opinions he addressed, including Dr. Devaux's opinion, "not persuasive." (*Id.* at 23.) In some respects, the state agency physicians' physical RFC assessments support the ALJ's RFC and conflict with, among other things, Dr. Devaux's physical RFC assessment and Plaintiff's testimony. (*See id.* at 19, 66-68, 80-81, 929-31.) Accordingly, the Court finds that conflicts in the record remain that the ALJ must resolve.

In any event, further proceedings would also be useful because the ALJ needs to resolve ambiguities in the record. The ALJ found the state agency physicians' opinions only "somewhat persuasive" because he concluded that additional "manipulative" limitations were "warranted based on the complete record, including records received after the [s]tate agency review [in May 2019 and January 2020]." (*Id.* at 23; *see also id.* at 66-68, 80-81, the state agency physicians completed physical RFC assessments on May 29, 2019 and January 28, 2020, and found no manipulative limitations). At the same, and although the ALJ found Dr. Devaux's opinion "not persuasive," the ALJ also stated that the "manipulative limitations [Dr. Devaux] describe[d] are generally supported and consistent with the record." (*Id.* at 23.) The ALJ identified Dr. Devaux's

"limitation in feeling" as an exception to Dr. Devaux's "generally supported" manipulative limitations. (*Id.*)

The prepared form Plaintiff's counsel presented to Dr. Devaux asked him separately to address: (1) "[r]eaching (overhead)," (2) "[r]eaching (shoulder height)," (3) "[h]andling (gross manipulation)," (4) "[f]ingering (fine manipulation)," and (5) "[f]eeling (skin receptors)." (*Id.* at 930.) Dr. Devaux did so and opined that Plaintiff needs to be limited to occasional (i.e., "1/3 of the workday") overhead and shoulder height reaching, and frequent (i.e., "2/3 of the workday") handling, fingering, and feeling. (*Id.*) Although he found Dr. Devaux's opinion about manipulative limitations other than feeling (skin receptors) "generally supported and consistent with the record," and formulated an RFC that accounted for Dr. Devaux's opinion that Plaintiff needs to be limited to frequent handling and fingering, it does not appear that the ALJ fully accounted for Dr. Devaux's limitation to occasional overhead *and* shoulder height reaching. (*See id.* at 19, 23.)

Courts consistently refer to reaching to as a "manipulative" limitation. *See Casiano v. Colvin*, No. 2:15-cv-01708, 2016 WL 4487718, at *5 (W.D. Wash. July 26, 2016) (explaining that SSR 96-8p "classifies lifting, carrying, pushing, and pulling as exertional limitation, but classifies reaching as a separate, *manipulative* limitation") (simplified), *report and recommendation adopted*, 2016 WL 4479983, at *1 (W.D. Wash. Aug. 25, 2016); SSR 96-8p, 1996 WL 374184, at *6 (July 2, 1996) ("[Nonexertional capacity] assesses an individual's abilities to perform physical activities such as postural (e.g., stooping, climbing), [and] manipulative (e.g., reaching, handling)[.]"); *see also Aguilar v. Kijakazi*, No. 21-35380, 2022 WL 2340804, at *1 (9th Cir. June 29, 2022) (explaining that the ALJ erred in assessing the RFC because he did not comply with SSR 96-8p); *Revels v. Berryhill*, 874 F.3d 648, 661 (9th Cir.

2017) (describing a VE hypothetical involving "a claimant who . . . had bilateral manipulative limitations allowing her to frequently do activities such as reaching overhead, handling, fingering, and feel"). Although the ALJ suggested that Dr. Devaux's manipulative limitations were more persuasive than the state agency physicians' findings of no manipulative limitations, the ALJ did not explain why or how an RFC limitation to occasional overhead reaching and frequent reaching in all other directions accounts for Dr. Devaux's opinion that Plaintiff needs to be limited to occasional overhead and shoulder height reaching.

The ALJ's lack of an explanation on this front, including as to whether there is any meaningful distinction between "shoulder height" reaching and "reaching in all . . . directions" other than overhead, is material. That is so because when Plaintiff's counsel asked the VE to assume that a hypothetical worker was limited to "no reaching overhead and occasional[] reaching in all other directions, and occasional handling and fingering," the VE testified that such an individual "would not be able to maintain competitive employment," and added that the "manipulative limitations would be preclusive." (Tr. 39.) The VE also testified that it would be "work-preclusive" if a hypothetical worker was "limited to occasional reaching and handling with the right, dominant extremity[.]" (*Id.* at 40-41.) The VE's testimony suggests (but does not clearly establish) that a limitation to occasional, as opposed to frequent, reaching in all other directions would result in a finding of disability here. Remand is appropriate to address this matter.

The Commissioner emphasizes that Dr. Devaux's form "distinguished between" reaching and manipulation, as it "contained separate categories" for gross and fine manipulation and reaching. (Def.'s Br. at 13.) The Commissioner in turn argues that the ALJ did not adopt and provided sufficient reasons for discounting Dr. Devaux's opinion about overhead and shoulder

height reaching. (*Id.*) The Court does not agree with the Commissioner's reading of the record

and finds that, at minimum, the ALJ needs to address the issues and authorities discussed in this

opinion.

For these reasons, the Court exercises its discretion to remand this case for further

proceedings.

## CONCLUSION

Based on the foregoing reasons, the Court REVERSES the Commissioner's decision and

REMANDS this case for further administrative proceedings consistent with this opinion.

**IT IS SO ORDERED.**

DATED this 23rd day of January, 2023.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge